IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller

Civil Action No. 03-cv-00097-WDM-MJW

PRAIRIELAND PROCESSORS, INC.,

    Plaintiff and counterclaim defendant,

v.

RIDGEFIELD FARMS, LLC,

    Defendant and counterclaim plaintiff,

and

WEST-CONN MEAT CO., INC. AND
RICHARD GREENFIELD,

    Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried to the court without a jury for seven days on March 6-14, 2006. Pursuant to Fed. R. Civ. P. 52, these are my findings of fact and conclusions of law.

### Parties

A. Plaintiff and Counterclaim Defendant is Prairieland Processors, Inc. (PPI), a Colorado corporation organized in 2001 as a meat processing facility in Commerce City, Colorado. It is no longer conducting business.

B. Defendant and Counterclaim Plaintiff is Ridgefield Farms, LLC (Ridgefield), a

Connecticut limited liability company with its principal place of business in Ridgefield, Connecticut. It continues to operate as a business.

C. Defendant West-Conn Meat Co., Inc. (West-Conn), is a Connecticut corporation with its principal place of business in New York, New York. It continues to operate as a business.

D. Defendant Richard Greenfield (Greenfield) is a resident of New York, New York and is a principal of West-Conn.

E. Counterclaim Defendants are PPI, Eldon Roth (Eldon), Regina Roth (Regina), Kevin LaFleur (LaFleur) and Donald Babcock (Babcock). The Roths are husband and wife and residents of South Dakota. Babcock and LaFleur are Colorado residents.

## Claims; Prior Proceedings

F. PPI made a plethora of claims, totaling 11 at the time of the pretrial order. Immediately prior to trial PPI restated and reduced its claims to the following: (1) goods sold and delivered against Ridgefield; (2) breach of contract against Ridgefield; (3) breach of fiduciary duty against Ridgefield; (4) intentional interference with contract against Greenfield and West-Conn; (5) fraudulent concealment against Ridgefield and Greenfield; and (6) false-representation against Ridgefield and Greenfield.

G. Defendant Ridgefield asserts the following counterclaims against Counterclaim Defendants: (1) fraudulent misrepresentation against PPI, both Roths, LaFleur and Babcock; (2) fraudulent concealment against PPI; (3) negligent misrepresentation against PPI, the Roths, LaFleur and Babcock; and (4) breach of

2

contract against PPI.

H. Following a three-day hearing on PPI's motion for prejudgment attachment, Magistrate Judge Michael J. Watanabe denied the motion by written order filed April 16, 2003. The order contained detailed findings that were not treated as binding by the parties.

I. Pursuant to the stipulation of the parties, Counterclaim Defendants Roths, LaFleur and Babcock were dismissed without prejudice on March 28, 2006.

## Findings of Fact

Based upon the foregoing and the evidence presented, I find by a preponderance of evidence as follows:

1. PPI was organized in 2001 by the Roths and Babcock as a meat-packing or processing facility with special emphasis on processing cattle that did not meet the size or grade standards of large meat packers, such as Iowa Beef Packers (IBP), commonly referred to as "out cattle."

2. PPI was the idea of Babcock who presented it to the Roths. They agreed to provide capital and other financial backing as the majority shareholders.

3. PPI began operations in the second half of 2001 and incurred greater losses than anticipated. Although its performance improved, there is no evidence that PPI ever operated on a profitable basis. Exhibit A-2 (loss of $3,722,458 on 2001 tax return); Exhibit A-51x (projected loss of 2002 approaching $3 million).

4. In January 2002, LaFleur became a co-president and was asked to evaluate PPI's operations to identify how it could be made profitable.

3

5. The Roths, Babcock and LaFleur all had extensive experience in the meat packing industry.

6. Ridgefield was formed in early 2001 as a beef marketing company. Its owners are Greenfield (30%), Roy Levy (Levy) (30%), Phil Friend (Friend) (30%) and Nino Flanagan (Flanagan) (10%).

7. The owners of West-Conn Meat are Greenfield (50%) and Levy (50%).

8. Greenfield and Friend had extensive experience in buying and selling meat in the eastern United States.

9. Since April 2001, Ridgefield has operated the "Ridgefield Farms Premium Hereford Beef Program" (Hereford Program or Program). The Program's product is sold to food service distributors and major retailers. It must meet certain standards established and monitored by the United States Department of Agriculture (USDA). As a consequence the packers or processors for Ridgefield were required to purchase cattle and process them according to Program specifications.

10. Prior to its dealings with PPI, Ridgefield acquired Hereford Program beef from Washington Beef and other distributors. Washington Beef acquired Hereford cattle, processed them, and then shipped the boxed meat to customers identified by Ridgefield.

11. Because Ridgefield could not meet Washington Beef's credit requirements of payment within seven days of shipping, West-Conn purchased beef from Washington Beef on behalf of Ridgefield. Ridgefield would thereafter pay West-Conn on separate seven day credit terms arranged between Ridgefield and West-Conn.

12. In the beginning Ridgefield's financial performance was mixed with both profits and losses in 2001. Its performance through the first nine months of 2002 showed a net income of $168,438.52. Exhibits 56 and 59.

13. In early 2002 Ridgefield was searching for an additional supplier for its Hereford Program because it wanted to expand beyond what Washington Beef was willing to produce and to reduce costs associated with shipment of meat from the state of Washington to the east coast. At the same time PPI was seeking other markets, including a potential "niche" market such as Ridgefield's Hereford Program.

14. In May of 2002 PPI and Ridgefield began negotiations concerning the processing and sale of meat. PPI was principally represented by LaFleur and Babcock and Ridgefield by Friend and Greenfield.

15. The parties exchanged some financial information and no party denied any request for information.

16. Friend and Greenfield recall being told by LaFleur that PPI was profitable and LaFleur provided them with *pro forma* projections indicating PPI's production was profitable on a per head basis. *See* Exhibits A-9 and A-14. LaFleur believed these to be accurate projections.

17. PPI's representatives were generally aware that PPI had not been financially successful. Indeed, LaFleur was specifically hired by Roths "to stop the [financial] bleeding." At the time of negotiations, however, LaFleur believed the financial performance of PPI had improved or, in his words, they had "stopped the bleeding."

18. Originally the negotiations focused solely on PPI becoming a packer for Ridgefield's Hereford Program as reflected in the agreement, dated June 10, 2002, and signed July 12, 2002. Exhibit A-5.

19. The Exhibit A-5 agreement was limited to Hereford cattle, contemplated production of 500 cattle per week, and set payments in accordance with a formula based upon USDA prices with an additional per-head fee for processing. It did not provide a time within which PPI was to be paid.

20. The parties never commenced business in accordance with Exhibit A-5 and instead continued to negotiate through July and into the first part of August 2002.

21. PPI proposed that the arrangement dealing with the Hereford Program be modified to include delivery of all of PPI's out-cattle to Ridgefield for its resale to customers. The proposal included transferring PPI sales personnel to Ridgefield because Ridgefield would have the sales responsibility for all cattle.

22. Babcock and LaFleur viewed such modifications as advantageous to PPI and so recommended to the Roths. *See* Exhibits A-8 and A-9.

23. Prior to arriving at an agreement, PPI conducted test runs of Hereford cattle for Ridgefield.

24. At the time of these negotiations, the parties understood that Ridgefield expected to start at 500 head of Hereford cattle on a weekly basis to be increased to 1500 or more head per week. *See* Exhibits A-5, A-7, A-8.

25. The parties agree that they entered into an oral agreement on or about August 12, 2002, which each has characterized as a joint venture. *See* Exhibits A-10

and A-13; Plaintiff's and Counterclaim Defendant's Corrected Statement of Elements of Claims for Relief, page 4 ("defendant was acting as a fiduciary of plaintiff with respect to the joint venture between plaintiff and defendant"); Defendants' Revised Proposed Findings of Fact, Conclusions of Law, and Judgment ¶ 12.

26. The terms of the August 12, 2002 agreement were:

   a. PPI would provide all of its production of Hereford and out-cattle to Ridgefield;

   b. Ridgefield would be billed and expected to pay PPI for such production in an amount equal to PPI's costs of cattle carcasses, together with freight and an $80 per head processing fee;

   c. Ridgefield would assume the sales responsibility for all cattle produced by PPI, including the hiring of PPI's sales staff; and

   d. Any profits received by Ridgefield in excess of the amounts due PPI and Ridgefield's cost of sales would be shared equally by the parties.

Plaintiff's and Counterclaim Defendant's Revised Proposed Findings of Fact and Conclusions of Law,¶ 27; Defendants' Revised Proposed Findings of Fact, Conclusions of Law, and Judgment, ¶12.

27. This agreement did not provide a time within which PPI was to be paid, when an accounting for profit or loss was to be made, or how long the agreement was to last. Indeed, both parties believed the agreement could be terminated at any time.

28. The parties dispute whether the joint venture included sharing of losses. Ridgefield asserts that it did as a standard joint venture. PPI claims the agreement was

only to share profits as defined, not losses; in other words, Ridgefield was to pay PPI for the cost of cattle as defined, share any profit, but assume the risk of loss alone while PPI assumed the risk that the cost of production may exceed $80.00.

29. PPI began processing and delivery to Ridgefield under the agreement on August 12, 2002, and continued until December 20, 2002, when PPI's operations were closed.

30. All product delivered during this time was invoiced by PPI to Ridgefield. The invoice described the number of head by carcass type and price and included the $80 processing fee. *See* Exhibit 2.

31. The total dollar amount of invoices was $19,021,118.35. Against that amount PPI credited $1,283,748.53 for various reasons. Ridgefield paid PPI $15,270,697.66. PPI claims $2,477,114.47 remain due and owing since December 24, 2002. *See* Exhibit 1.

32. For some unknown reason[1] neither party presented evidence of the amount paid Ridgefield by its customers for sales of PPI product. *(See* testimony of Friend in response to court's questions). Accordingly, it is not possible to determine whether or not the venture made a profit or suffered a loss in accordance with the terms of the August agreement.

33. Ridgefield incurred costs of sales otherwise chargeable to the venture. These included additional payroll of $379,496.80 and financing charges of

---

[1] It appears to have been in the interest of at least one party to have proved this number. If there was a profit, PPI has a claim to its shares; if there was a loss, Ridgefield believes PPI should be responsible for half of it.

$379,674.73, totaling $759,171.62.  See Exhibit A-65.  Because of the failure of proof of the gross income, the effect of these costs on profit or loss cannot be accounted for.

34. In January 2003, the parties agreed that Ridgefield should return product weighing 137,185 pounds to PPI.  Its value was not stipulated, but at trial the uncontested testimony of Friend was that the average sales price for this type of product at the time was $2.15 a pound, which results in a total value of venture product transferred to PPI of $294,948.

35. The sales consummated by Ridgefield at the end of the relationship resulted in its receipt of $187,653.53, which are considered venture funds.  They were placed in escrow to be applied to this case.  See Exhibit A-33.

36. Ridgefield also claims a credit for what it asserts was an overcharge on pricing.  The agreed upon term was for Ridgefield to pay PPI its costs of acquiring the Hereford carcasses plus $80 per head processing fee.  Ridgefield through Friend proposed using a price formulation based upon USDA grades.  According to a calculation conducted by Friend, that would have resulted in a $153,215.73 credit for the benefit of Ridgefield.  See Exhibit A-67.  I find that Ridgefield has not proved such a pricing agreement by a preponderance of the evidence.

37. There is uncontested testimony that a by-product of PPI's processing of venture cattle was XF fat, which has a value.  At least some of that venture XF fat was shipped to BPI, a company owned by the Roths.  No evidence was presented of any payment being made to the venture on account of that XF fat, and I have no basis to value it.

38. While the venture was in operation Ridgefield continued to buy product from Washington Beef for the Program, either directly or by using West-Conn as an intermediary. This fact was known by executives of PPI from the beginning of the venture. *See* Exhibits A-10; A-13 (joint letter referring to "second fabrication facility"); and 11. Further, given PPI's slowness in processing cattle as discussed below, Ridgefield necessarily continued purchasing carcasses from Washington Beef through West-Conn to satisfy the demand for Hereford Program beef.

39. Ridgefield's payments to Washington Beef or West-Conn on account of Washington Beef's production was in accordance with Ridgefield's obligations, and PPI knew of those obligations.

40. At the beginning of the venture, PPI's production of Hereford Program beef was significantly less than the anticipated minimum of 500 head per week. *See* Exhibit A-5. PPI's Hereford production did not reach 500 head until the week of September 22. The highest week of production was 754 head. Over the 19 weeks of the venture PPI averaged approximately 400 head per week and had only five weeks of production greater than 500. In the end its production was only 39% Hereford carcasses as opposed to 61% out-cattle carcasses. *See* Exhibit A-66.

41. Ridgefield never sought to terminate the venture because of inadequate production of Hereford carcasses.

42. Until the last few weeks of its operations PPI continued to process and deliver out-cattle to Ridgefield, which Ridgefield accepted and sold. Exhibit A-66.

43. Almost immediately after commencing operations in accordance with the

understood terms described in paragraph 26 above, the parties began negotiating various terms to modify or supplement their the understanding. With certain exceptions, further agreement was never reached.

44. PPI and the Roths sought to require payment to PPI from Ridgefield within 21 days of billing. They also sought to include a payment to Roths for their investment in or advances to PPI. See Exhibits A-15 and A-16. Ridgefield never agreed.

45. In an attempt to expedite payment to PPI, Ridgefield entered into financing arrangements first with Entrepreneur Growth Capital (EGC) and then the Roths' banker, Wells Fargo Business Credit, Inc. (Wells Fargo). Although these arrangements somewhat expedited the cash flow from Ridgefield's ultimate customers through Ridgefield to PPI, PPI was never satisfied.

46. Although the timing of payments to PPI improved in the last weeks of the venture, PPI unilaterally halted production on December 20, 2002, and declared that the joint venture was terminated or at an end.

47. Within days of terminating the joint venture, PPI retained Crossroads, LLC to review PPI's financial information and history of operation to determine what caused the losses and whether the business was viable. Exhibit A-40. Crossroads issued a draft report indicating that PPI lost over $10 million in its two years of operations. Exhibit A-43. The report preliminarily found that cash advanced by the Roths was used to cover operating losses "fueled by substantially higher raw material cost as a percent of sales and below plan unit production." The report ultimately concluded that the business was not viable without substantial infusion of capital.

48. PPI resisted disclosing this report to Ridgefield and has never paid Crossroads for its work.

49. PPI did not knowingly or negligently conceal any information from Ridgefield during the parties' negotiations and operations.

50. PPI did not knowingly or negligently misrepresent to or conceal material facts concerning its financial condition from Ridgefield's representatives.

51. Ridgefield and Greenfield did not knowingly or negligently misrepresent to or conceal any material fact from PPI's representatives.

52. Defendants Greenfield and West Conn did not cause Ridgefield to fail to perform its contract with PPI or to interfere with Ridgefield's performance of that contract.

## Conclusions of Law

Based upon the foregoing and with consideration of the parties' arguments, I conclude the following as a matter of law:

1. As argued by both parties and confirmed by their course of conduct, PPI and Ridgefield entered into an oral contract in August 2002, with the following essential terms:

    a. PPI would purchase cattle carcasses, process them, and deliver fabricated beef to Ridgefield;

    b. Ridgefield was to pay PPI its cost of carcasses plus freight and an $80 per head processing fee, regardless of PPI's actual cost of processing;

    c. Ridgefield would sell the fabricated beef to customers; and

d. Any excess of the sales proceeds received by Ridgefield beyond the costs paid to PPI and Ridgefield's costs of sale was to be shared equally between the parties.

2. This was an agreement between competent parties, supported by consideration, with a mutuality of agreement and obligations and hence an enforceable contract. *See* CJI- Civ. 4th § 30:2; *Denver Truck Exch. v. Perryman,* 307 P.2d 805, 810 (Colo. 1957).

3. This was a mutual understanding of the parties to carry on a business for profit in which the parties had a joint interest in property, namely the cattle, for the limited purposes provided. As such, it was a joint venture. *See* CJI-Civ. 4th § 7:21; *Battman v. Wells Fargo Ag Credit Corp,* 802 P.2d 1112, 1117 (Colo. App. 1990).

4. In a joint venture, the members share the profits and the losses even without an express agreement. If one member is to receive a fixed sum, regardless of profit and loss, then there is no joint venture. *Id.*

5. PPI substantially performed the contract. To the extent the production was less than anticipated, it was a minor variance which was waived by Ridgefield by its ongoing course of conduct. *See* CJI-Civ. 4th § 30.7.

6. Ridgefield breached the parties' contract by failing to pay the amounts due for beef accepted by it and not otherwise paid or accounted for after PPI had substantially performed. *See* CJI-Civ. 4th § 30:1.

7. Given that the price was agreed upon, the amount due less appropriate adjustments is the proper measure of damages for Ridgefield's breach of contract. CJI-

Civ. 4th, § 30:40.

8.  The unpaid PPI invoices totaled $2,477,114.47 as of December 24, 2002. That amount should be reduced by an adjustment of $294,948 for beef returned to PPI, leaving total damages of $2,182,166.47.

9.  Because of the failure of proof to enable determination of profit or loss of the venture, it is impossible for the court to make any adjustment for profit or loss or to credit Ridgefield for its costs of sales.

10.  The $187,653.53 in escrow, together with accrued interest, shall be paid to PPI as credit against the damages award, leaving $1,994,512.94 due PPI.

11.  The amount due PPI is on account and PPI is entitled to interest on the $1,994,512.94 at the rate of 8% per annum, compounded annually from February 1, 2003.  Colo. Rev. Stat. § 5-12-102(2).

12.  The agreement between the parties was not simply for the sale and delivery of goods.  Given the relief granted on its contract claim, PPI's claim for recovery for goods sold and delivered is dismissed.

13.  PPI failed to prove Ridgefield breached any fiduciary duty owed PPI when Ridgefield paid West-Conn or Washington Beef and PPI's claim is dismissed.

14.  PPI's claim against Greenfield and West-Conn for intentional interference with contract is dismissed as PPI failed to prove that either intentionally caused Ridgefield not to perform its contract with PPI or somehow interfered with Ridgefield's performance of the contract.  CJI-Civ. 4th § 24:1.

15.  PPI's claim against Ridgefield and Greenfield for false representation is

dismissed as PPI has failed to prove that either defendant made any false representation of a material fact with the intent that PPI rely on it. CJI-Civ. 4th § 19:1.

16. PPI's claim against Ridgefield and Greenfield for fraudulent concealment is dismissed as PPI has failed to prove that either defendant failed to disclose a material fact with the intent to create a false impression. CJI-Civ. 4th § 19:2.

17. Because Ridgefield did not prove by a preponderance of the evidence that PPI knowingly made a false representation of a material fact with the intent that Ridgefield would rely upon it, Ridgefield's counterclaim for false representation is dismissed. *See* CJI-Civ. 4th § 19:1;

18. Because Ridgefield failed to prove by a preponderance of the evidence that PPI concealed or failed to disclose a material fact with the intent to create a false impression, Ridgefield's claim for fraudulent concealment is dismissed. CJI-Civ. 4th § 19:2.

19. Because Ridgefield failed to prove that PPI provided or supplied Ridgefield false information with the intent that Ridgefield rely on it, Ridgefield's counterclaim of negligent misrepresentation is dismissed. CJI-Civ. 4th § 9:4.

20. Because each party had the right to terminate the agreement and because Ridgefield accepted PPI's production of Hereford Program cattle during the venture, Ridgefield has failed to prove PPI breached the contract. CJI-Civ. 4th § 30:1.

21. PPI may have its costs pursuant to law.

22. Judgment shall enter accordingly.

DATED at Denver, Colorado, on June 6, 2006.

BY THE COURT:


s/ Walker D. Miller
United States District Judge